Pao Tatneft, v. Ukraine, C.O. Mr. Pavlov, D.O. Mr. Assessor of Policy, campus of the U.S. House of Representatives Mr. Assessor of Policy, campus of the U.S. House of Representatives  Mr. Nichols Good morning, your honors. Thank you, and may it please the court, private party is a statutorily predicate jurisdictional term. A district court applying the arbitration exception must apply itself. The district court here did not apply that term. To the contrary, the district court said, quote, I will defer to the tribunal's determination on jurisdiction. That was a categorical error. It's an error because under the Supreme Court's decision of Verlinden, well, a couple reasons, under the Supreme Court's decision of Verlinden, at the threshold of every action, a district court must satisfy itself that one of the FSIA exceptions applies. And in doing so, it must apply, quote, the detailed federal law standards set forth in the act. That did not happen here. The district court said over and over again, I defer to the tribunal's findings. The tribunal found the tribunal's jurisdiction was not an issue at that point in the discussion. There was no that was not even relevant. What was what needed to be addressed right off the bat was what does private party mean? Who's coming in? Who's petitioning? Are you a private party? As the Supreme Court told us last year in Venezuela versus Helmerich, it's not even enough to say, oh, well, we are. We presented a non-frivolous claim that we're a private party. In fact, they have to have evidence. Judge Justice Breyer said we have to we have we may have to take evidence and resolve it as soon as possible. At the beginning of the case. Even if we were to agree with you, there was a different basis for waiver of sovereign immunity that the district court found, the implied waiver. So that alone would be sufficient to subject your client to jurisdiction. Correct? Correct. So even if we were to agree with you, we have this alternative basis. And what is improper about that? Sure. What was improper about it is that an implied waiver has to be under this court's decision. And Creighton has to be unambiguous. It has to be unmistakable. How can an implied way we said that signing the New York Convention would be an implied waiver? We said you said that in dicta and it's incorrect because. Well, we said it in drawing the line between what is or is not a waiver. And we distinguish two lines of cases. Right. The ones where the signatory government has signed and the ones where the signatory. I'm sorry. The ones where the foreign state has signed the New York Convention and the ones where it hasn't. We said that was the relevant line. Right. But I don't think it's reasoning necessary to the decision because the court was never faced with the question of, which is faced in this case with the convention signatory. And I want to point the court to Amrata Hess, which which addresses precisely the question your honor is asking. Amrata Hess says a country does not waive its immunity under 6501 A1 by signing an international agreement that contains no mention of a waiver of immunity to suit in the United States. That's the New York Convention. There is no waiver of immunity. And it wouldn't have made sense in 1958 to even consider consider that. Not only does it not mention it, it's not even couldn't have been applied because the regime at that point was a regime of absolute. No, it wasn't. It's post 1952. Come on. Oh, no, your honor. We understand the Tate letter existed, but the Tate letter did not by itself change the law across the courts. And as your honor knows, the Supreme Court has said time after time after that, that the Tate letter did not change background principles of law. It simply shifted the right, which is to which is to say that exceptions like commercial activity and I would assume waiver existed even as of 1952, much less later. Well, I just don't know how you get to unmistakable and unambiguous given under the Tate letter when you are Ukraine and you're Ukraine and you're signing a convention in 1958. And you're supposed to know that by doing that, a letter from the act, an acting legal advisor in the Department of State means you have waived your sovereign immunity to enforcement of awards in the United States. That just doesn't make sense. That is not what Ukraine could have possibly been thinking. And that's why respected that's why your honor, my opponent, our opponent has moved on from this argument. And they say, oh, well, the B.I.T. or they say the Tate letter changed the change. But it could not have. It could not have. Do you know anything about the history of waiver exceptions to I mean, if in 1940, if someone had sued a foreign sovereign in a federal court. Could the could the foreign sovereign have waived its immunity? I would assume so. I don't know. I don't know. Yeah, I don't know. But I want to go back to what we need to see what we're building on here. We need to start from first principles. We need to see what we're building. What we're building on is we're building on a regime where you have a letter from the Department of State. We have a New York convention with no language concerning waiver of sovereign immunity. And we have a B.I.T. that doesn't mention or locate arbitration in the United States. It doesn't choose U.S. law. It doesn't have any U.S. parties. And in fact, contemplated enforcement in Ukraine. So we don't we don't get anywhere near an unmistakable or unambiguous waiver through a treaty itself. It doesn't mention it or a letter from the Department of State that alludes to these principles. It's just not in the realm of of unmistakable or unambiguous. And I would point out, I want to make sure that we're just clear. We don't think that. But so we said by implication and the Second Circuit has explicitly held that notwithstanding Amaretta Hess and notwithstanding your first principles arguments to us that signing the New York convention is enough on some theory that it's all about enforcement of arbitral awards. Well, keep in mind that sea transport, which is the case you're referring to, was I'm into my rebuttal time. I would like to point out sea transport was a commercial contract. It was not and it did not involve a treaty as the B.I.T. does here. It also located French law. It selected French law, which is another indication of waiver. So we don't think the court needs to create a circuit split with sea transport. This case is much more like Fulova in the Seventh Circuit, which said that the Helsinki Accords did not constitute a waiver. Before I sit down, I want to point out the court textually cannot reach this question. Textually, under the FSIA, implied waiver by itself is off is off limits because of the private party requirement. Now, if the court reaches the question, I think all of my arguments stand. But I want to point out that the private party requirement is a predicate to getting to implied waiver. Your theory is that Exemption 6 affected an implied partial repeal of Exemption 1, right? You say we can't consider implied waiver in an arbitration case because that subject is more specifically addressed in the later abrogation. Am I understanding it? No, I apologize if that's how that came out. I thought that's what I got from your brief, but tell me why that's wrong. The point is that the court can't get to implied waiver without crossing the private party threshold. So one has to conclude, one has to... I'm sorry, but the private party requirement is an element of 6, not an element of 1. Correct, correct. And so the point is that when one wants to enforce an arbitration award, one has to go through the gate 6. Otherwise, gate 6, subsection D... Why not go through gate 1? Because that would render gate A6D superfluous. One would never need to show that one was a private party. One would always come in and say implied waiver, and A6D would be superfluous. This Court does not read statutes to render provisions meaningless. The arbitration exception is created for a reason. It's for countries like Tatarstan to not come in masquerading as a corporation and to do what's happened here. I'll save the rest of my time for rebuttal. Thank you. May it please the Court, I'm Jonathan Blackman representing Totneff. The district court was completely right on both of its rulings on subject matter jurisdiction under both the arbitration exception and the implied waiver exception, and also on foreign nonconvenience, which my friend seems appropriately not to be pursuing here anymore, in light of the court's TNR decision, which actually is against the entity of Ukraine. But on the jurisdiction issue, the judge below was entirely correct. This private party issue was, in fact, decided by the arbitral tribunal, which specifically found that Totneff was a, quote, private investor. And it analyzed all the same facts that are now being presented by the appellant on this private party argument, and it concluded that Totneff was a, quote, private investor. That's the end of the story. Under your decision in Chevron. But that was all in the course of addressing whether the claimant was an investor within the meaning of the relevant bid, right? And that definition is somewhat idiosyncratic and specific to Russia and Ukraine. So why would we think that private party in that context equates to private party as the phrase is used in the FSIA? Because you held in Chevron following the Supreme Court in BG that when an arbitral tribunal that the parties have agreed has jurisdiction to decide its jurisdiction, makes that decision, you have to defer to it. And the precise issue of the status of Totneff was raised as a jurisdictional objection before the tribunal. Of course, the tribunal wasn't thinking in FSIA terms. But all the underlying facts that my friend said you need to decide, the district court needed to decide, were, in fact, decided by the tribunal in deciding that it had jurisdiction. Only if the private party inquiries are identical for purposes of the bid, as to which I take your point, but arguably there's a separate element in the FSIA regarding not the jurisdiction of the tribunal, but the jurisdiction of the district court. Well, if private party has some other meaning, we haven't seen any case, any legislative history, any scholarly commentary, anything that would suggest it would mean anything other than an entity that is not majority owned by a state. At a minimum, private party can't be something other than a non-agency or instrumentality, as we point out, which clearly Totneff is not. I mean, there is no case that suggests that a 36% state-owned company with some state-appointed directors, but that it's a public company with its shares publicly traded, held by the public, is anything other than a private party. That's what the tribunal found, examining all of the facts, an 80-plus page award, which it rendered at Ukraine's behest. Ukraine wanted to raise that as a jurisdictional objection, and now they're trying to repackage it. It's a very clever argument. Is there some background principle of international arbitration in the context of these investment disputes that only private parties can arbitrate against states in this context? I mean, these bits are all designed to allow investors to arbitrate against states. Who the investor is depends on... Depends on the bit. Depends on the language of the bit, which was construed by the tribunal. So there's no reason to think that private party, as defined in one bit, would be the same as private party defined in any other bit, would be the same as private party as defined in the FSIA? Correct. But the point is, you don't need to get into that de novo or indeed at all, because the facts that were found, which you can't overrule, would satisfy any conceivable definition that you as a federal court would attribute to the words private party in section 1605A6. Because all we have from the other side is, well, you know, we don't like Totneff. We think it's somehow connected with Tartarstan. That makes it a non-private party. The tribunal looked at all of that stuff and came out exact opposite. So if BG, which I argued and lost, I have to say, means anything and your decision following it in Chevron is very clear on this, that's the end of the issue as far as your subject matter jurisdiction is concerned. Plus, of course, you do have A1. And on A1, my friend, with all respect, was just wrong on every possible issue. Of course the Tate letter changed the law. Every case that the Supreme Court has ever decided, when they begin and review the history of the FSIA, they say the Tate letter was the kind of tectonic shift. But beyond that, beyond that, you have held in Creighton, you couldn't have been clearer. Yes, it was technically dictum. But you, as you said, Judge Katz, drew this very clear line. And every court that has addressed the issue has done that. And no one has ever remotely suggested that 1605A6, which was designed, if anything, to expand and clarify the arbitration waiver for somehow was an implied repealer of 1605A1. If you look at the history of the FSIA in 76, three examples are given. They're cited again and again by the courts of what an implied waiver is. And the first one is agreeing to arbitrate in a foreign state. And every court has held that the New York Convention, if everyone here is a signatory, which is the case, Ukraine is a signatory, Russia is a signatory, the United States is a signatory, France, which is the seat of the arbitration, is a signatory. That is enough. I mean, the whole point of this treaty is to allow an award to be enforced elsewhere in a signatory state. That's why Creighton is right. That's why sea transport is right. And again and again and again, if that's not a waiver, it's hard to see what is. I sign a treaty whose entire raison d'etre is that once I've arbitrated, an award against me can be enforced in other courts. How can I then say that I haven't waived my immunity to be sued in those courts? Do you have any idea why the private party requirement was put into A6? I mean, it does seem odd that when Congress comes to focus more specifically on the legal consequences of signing an arbitration agreement, they limit the rule to cases where the claimant is a private party. We haven't found any. They haven't found any. But what we do know, I mean, we cited in our brief Mark Feldman, who has spent a lot of time on the ABA committee. And the FSA is a lovely statute because it actually was a product not only of bipartisan approval, but it was supported from day one, including when it was amended in 1988, to have the arbitration exception by the entire organized bar that does this stuff. And there's not a hint there of any attempt to cut back on A1. This was an attempt to expand the scope, to make it clear beyond per adventure that there would be jurisdiction to enforce an arbitral award as long as you were a signatory. Is your argument confined to subsection 6, that even if the entity is not a private party, nevertheless the agreement was made for the benefit? You don't have to be a party to the arbitration. Is that argument dependent upon who the shareholders are? Is it dependent upon the shareholders? No. Are there any private entities that own, you know, shares in this company? Yes. I mean, the entity Totneft is 36 percent owned by the Republic of Tatarstan. The rest of it are private parties. The rest are private parties. There's no evidence whatever except some age hand. Is it your argument that the agreement to arbitrate was for the benefit of a private party because they're 70 percent of the shareholders are private parties? Well, yes. And also for the benefit language, which I hadn't gotten to, so I'm glad you did, Judge Randolph, also kind of gives the lie to my adversary's argument because a bit is the classic example, again, pointed out in all the legislative history, all the cases, of an agreement that a state makes not directly with a private party but for the benefit of private parties. And unless you were to go back to their basic point, which is notwithstanding the tribunal's decisions, notwithstanding the tribunal's conclusions, somehow a 36 percent state interest equates Totneft to being a non-private party, then they lose. They lose under A-6 and they also lose under A-1. And they had a chance to make this argument. They lost before the tribunal. They lost in the Paris Court of Appeal. They lost in the English High Court. They lost before Judge Collar-Gatelli. And they're industrious and creative, but they have to lose here. Your cases are clear on that point. Thank you. Thank you. All right. How much time does the appellant have left? We have 30 seconds remaining. All right. We'll give you two minutes. Thank you, Your Honor. This is not Chevron. Counsel is mistaken. This case, as Judge Katz has had questions that made clear, shows that this is not about a provision that was submitted to the arbitrators. And we have to start down the right path. So, Judge Randolph, your question about who's for the benefit of whose private party, the district court didn't even define what private party means as a matter of federal law. That's square one. Before one could ever ask whether TATNAF qualifies, do we have enough facts? By your license, this is a jurisdictional question. Correct. Right? That's exactly right. And so, regardless of what the district court decided, you know, the standard federal appellate law, that we can sui sponte consider jurisdictional questions. Your Honor, you may. And we think you can. And we think you should reverse on the basis of this record. But I'd point out that there is no discovery in arbitration. And the limited record that we have revealed TATNAF telling the SEC that Tatarstan mandated oil sales and caused us to raise capital for the benefit of Tatarstan and pay the debts in Tatarstan. Do you dispute that 70% of the shareholders are non-governmental entities? We don't know right now because we haven't been able to have discovery. All we have is the record that was in arbitration. And what the Supreme Court said last year in Venezuela is that you need to have discovery up front. And that has not happened here. Let me address the Tate letter issue and the issue of implied waiver. Because the Tate letter, the Supreme Court would be very surprised to learn what my colleague said about the impact, the titanic impact of the Tate letter. The Supreme Court said in 2004 the Tate letter had little if any impact on the federal court's approach to immunity analysis. In 2014, in Argentina v. NML Capital, it said that the FSIA replaced the factor-intensive, loosely common-law-based standards. And until then, Ukraine's signing couldn't have been a waiver because it was a loose, common-law-based regime until the codification. That's what the FSIA was for. The whole reason the FSIA exists is because the Tate letter didn't do what Your Honor suggests that it did. We ask the court to reverse. Thank you. Thank you. The letter is submitted.
judges: Wilkins, Katsas, Randolph